Don PADOU, Petitioner,

v.

DISTRICT OF COLUMBIA ALCO-
HOLIC BEVERAGE CONTROL
BOARD, Respondent,

and

Stadium Group, LLC, Intervenor.

No. 11–AA–0098.

District of Columbia Court of Appeals.

Submitted Nov. 13, 2012.

Decided March 5, 2013.*

---

* The decision in this case was originally re-
leased as an unpublished Memorandum
Opinion and Judgment on March 5, 2013.
Pursuant to D.C.App. R. 36(c), we granted
the Alcoholic Beverage Control Board's con-
sent motion to publish.

 

Don Padou, pro se.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Richard S. Love, Senior Assistant Attorney General, were on the brief for respondent.

Stephen J. O'Brien, Washington, D.C., was on the brief for intervenor.

Before BLACKBURNE–RIGSBY and McLEESE, Associate Judges, and NEWMAN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Petitioner Don Padou challenges an order issued by the Alcoholic Beverage Control Board ("ABC Board") that granted Stadium Group's request to renew a liquor license for its nude dancing club, Stadium Club. Mr. Padou, who is concerned that Stadium Club will disrupt the peace, increase crime, and decrease the real property values in the surrounding community, contends that the ABC Board failed to comply with statutory requirements when it renewed Stadium's license. Respondent, the ABC Board, and intervenor, Stadium Group, LLC ("Stadium"), contend that Mr. Padou lacks standing to challenge the license renewal. We agree and dismiss Mr. Padou's petition for lack of standing.

## I.

Mr. Padou lives at the 1300 block of Lawrence Street, N.E., Washington, D.C., which is over one mile from the Stadium Club, located at 2127 Queens Chapel Road, N.E., Washington, D.C. On April 30, 2010, Stadium sought to renew the liquor license for its nightclub pursuant to D.C.Code

§ 25–791(f) (2001).[1] A group of approximately twenty-one protestants, who were initially represented by Mr. Padou, contended that the renewal of Stadium's license would "disrupt the peace, order and quiet of [their] community and negatively impact public safety and real property values." The protestants filed a petition before the ABC Board and alleged that the ABC Board "violated the law in its handling of the license relocation from 900 First Street[,] [S.E.]; the license renewal; license safekeeping; and transfer of license ownership from Black Ride III to Stadium Group LLC." The protestants argued that, because the ABC Board failed to comply with statutory requirements, the ABC Board did not have the authority to renew Stadium's license.[2] In response to the protestants' motion, the ABC Board held a protest hearing on August 4, 2010. On September 29, 2010, the ABC Board denied the protestants' motion and granted the renewal of Stadium's license, concluding that the protestants lacked standing because they alleged only generalized grievances.

■■ We clarify that, while the initial petition before the ABC Board was brought by a group of twenty-one protestants, Mr. Padou is the only petitioner named on the petition before us.[3] A "party that intends to appeal an order must be named or somehow designated in the notice of appeal." *Patterson v. District of Columbia*, 995 A.2d 167, 170 (D.C.2010). Consequently, we conclude that Mr. Padou is the sole petitioner, and for purposes of determining standing, the claims raised by the other petitioners are not before us.

## II.

In response to Mr. Padou's petition for review, the ABC Board and Stadium argue without holding a public meeting pursuant to D.C.Code § 25–204.01(c)(4) (2008); (4) the ABC Board erred by not issuing its order in writing pursuant to D.C.Code § 25–433(c) (2001); (5) the ABC Board erred by renewing the license after it had expired and therefore already canceled by operation of law; (6) the ABC Board abused its discretion by renewing Stadium's license because Stadium violated D.C.Code § 25–372 (2001) by offering lap dances; and (7) the ABC Board erred by approving substantial changes relating to the ownership of the liquor license without providing a public hearing pursuant to D.C.Code § 25–404 (2001).

1. D.C.Code § 25–791(f) (2001) requires that a license must be renewed if the license has been placed in safekeeping for more than two years. The Stadium liquor license was previously held by the owner of a different nightclub with nude dancing called Black Ride III, which was located at 900 First Street, S.E. In 2007, the ABC Board approved a request by Black Ride III to relocate its liquor license to 2127 Queens Chapel Road, N.E. and place the license into safekeeping. Approximately two years after the liquor license was placed into safekeeping, the ABC Board approved Stadium's request to purchase the license from Black Ride III on May 27, 2009. In 2010, Stadium sought to remove the license from safekeeping and renew it pursuant to § 25–791(f).

2. In particular, the protestants contended that the ABC Board did not comply with the following statutory procedures: (1) the ABC Board erred in failing to make statutorily required findings of fact and conclusions of law pursuant to D.C.Code § 25–301 (2010); (2) the ABC Board erred by allowing the liquor license for Stadium to be transferred to a property zoned CM2, in violation of D.C.Code § 25–374 (2007); (3) the ABC Board erred by renewing Stadium's license

3. Although D.C.Code § 25–601(2) (2001) requires groups of five or more persons to petition the ABC Board, this court has jurisdiction over Mr. Padou's individual petition pursuant to D.C.Code § 2–510(a) (2001), which provides that we review decisions by the ABC Board when "[a]ny person suffer[ed] a legal wrong, or [was] adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case."

that Mr. Padou lacks standing to challenge the ABC Board's decision to renew Stadium's license. Mr. Padou responds that he has standing to challenge whether the ABC Board failed to comply with statutory procedures when renewing Stadium's liquor license, because the renewal of Stadium's license will: (1) disrupt the peace, order, and quiet of the community; (2) increase crime in Ward Five; and (3) negatively impact real property values in Ward Five.

"[S]tanding is a question of law which we consider on appeal *de novo*." *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 705 (D.C.2009) (citation omitted and internal quotation marks omitted). Although "Congress did not establish this court under Article III of the Constitution," we still "apply in every case the 'constitutional' requirement of a 'case or controversy' and the 'prudential' prerequisites of standing." *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C.2002) (citations omitted). "In enforcing these requirements, we look to federal standing jurisprudence, [both] constitutional and prudential." *Id.* (citation omitted).

The "*sine qua non* of constitutional standing to sue is an actual or imminently threatened injury that is attributable to the defendant and capable of redress by the court." *Id.* at 1206–07. To establish constitutional standing, petitioner must show: (1) an injury in fact; (2) a causal connection between the injury and the conduct of which the party complains; and (3) redressability. *Brentwood Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 661 A.2d 652, 654–55 (D.C.1995) (citations omitted). A petitioner establishes an "injury in fact" by alleging "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent,

not conjectural or hypothetical." *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1079, 1084 (D.C.2004) (citation omitted). Furthermore, "under the so called prudential principles of standing, a plaintiff may only assert its legal rights, [and] may not attempt to litigate generalized grievances." *See, e.g., id.* (concluding that petitioner lacked standing to assert generalized claims that creating a new college dormitory would result in the loss of new property tax revenue, new jobs, and new essential housing in the Downtown area); *Dewberry v. Kulongoski*, 406 F.Supp.2d 1136, 1143–45 (D.Or.2005) (holding that the allegations that casino gaming activities would result in higher taxes, reduced property values, and increased traffic congestion on surrounding streets, and would detrimentally affect local businesses were not sufficiently concrete or particularized to confer standing and instead were generalized grievances).

Mr. Padou does not establish an "injury in fact" by alleging that the renewal of Stadium's license will disrupt peace and order and increase crime in the community. In the petition, Mr. Padou contended that existing "sexually-oriented businesses" contributed to high crime in Ward Five and disrupted the peace. Consequently, he speculated in his petition that renewing a liquor license for a nude dancing establishment would also increase crime in the protestants' neighborhood. These allegations fail to establish that Mr. Padou suffered any actual harm or imminent harm. Further, in determining whether a petitioner has suffered an "injury in fact," courts consider the proximity between the petitioner and the location of the conduct of which the petitioner complains. *See City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975) ("[T]he procedural injury implicit in agency failure to

prepare an [Environmental Impact Statement]—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a *sufficient geographical nexus* to the site of the challenged project [such that they can] expect to suffer whatever environmental consequences the project may have.") (emphasis added) (citations omitted); *accord Lujan v. Defenders of Wildlife,* 504 U.S. 555, 577 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Riverhead PGC, LLC v. Town of Riverhead,* 73 A.D.3d 931, 905 N.Y.S.2d 595 (2010) (holding that a petitioner who owned a shopping center did not have a requisite injury in fact to complain that a proposed development of a Walmart would increase traffic congestion and decrease the owner's property value, because petitioner's property was located over two miles away from the new Walmart). Critically, Mr. Padou does not live in the immediate proximity of Stadium's nude dancing establishment; instead, he lives over one mile away. In fact, the Stadium Club is not located on a residential street or in a residential neighborhood. Additionally, Mr. Padou does not allege how renewal of Stadium's license will disrupt the peace, order, and quiet of his home located well over a mile away from the club. We conclude that Mr. Padou failed to allege any actual or imminent injuries based on his claims that the license renewal will result in increased crime and disrupt the peace and order of the community.

■ Rather than alleging an injury in fact, Mr. Padou's claims are generalized grievances. By alleging that the renewal of Stadium's license will disrupt the peace, order, and quiet of his community, Mr. Padou fails to establish that he would suffer any harm different from that shared by members of his surrounding community. Alleged harms "shared in substantially equal measure by all or a large class of citizens" are called generalized grievances and "do not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citations omitted). Consequently, we conclude that Mr. Padou's allegations are "generalized grievances" that do not provide a sufficient basis for standing.

■ Additionally, Mr. Padou does not gain standing by alleging that the renewal of Stadium's liquor license will negatively impact real property values. Because Mr. Padou is alleging that real property values will decrease in the future, he has not established that he suffered any actual harm. Further, Mr. Padou's allegations concerning real property values fall short of establishing that he will suffer any imminent harm. "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative...." *Lujan, supra,* 504 U.S. at 564 n. 2, 112 S.Ct. 2130 (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The concept of imminence is "stretched beyond [its] breaking point when ... the plaintiff only alleges [some] injury at an indefinite future time...." *Id.* In his brief, Mr. Padou alleges that community members will "see their property values adversely affected by the increasing reputation of Ward Five as the 'dumping ground' for undesirable businesses such as strip clubs like Stadium." These claims by Mr. Padou suggest only a hypothetical possibility of how the renewal of Stadium's license might impact property values around his home. *See York Apartments Tenants Ass'n, supra,* 856 A.2d at 1085 (allegations made by a petitioner which are merely conjectural or hypothetical fail to establish

the "injury in fact" requirement for standing).

For the foregoing reasons, we conclude that Mr. Padou lacks standing to challenge the renewal of Stadium's license, and we dismiss his petition for lack of standing.[4] *See, e.g., id.,* 856 A.2d at 1086.

*So ordered.*

4. We do not foreclose the possibility that an alleged disruption of peace and a threat of diminishing property values could *ever* constitute an injury in fact. However, for the foregoing reasons, Mr. Padou's particular circumstances fail to qualify as anything other than generalized grievances.