*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-543

UMC DEVELOPMENT, LLC, *et al*., APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CA-3789-13)

(Hon. Frederick H. Weisberg, Trial Judge)

(Argued March 19, 2015                    Decided July 9, 2015)

*Derek L. Shaffer*, with whom *Jonathan G. Cooper* was on the brief, for appellants.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Eugene A. Adams*, Interim Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellees District of Columbia and Mayor Vincent Gray.

*Emil Hirsch*, with whom *Steven A. Pozefsky* was on the brief, for appellee Not-For-Profit Hospital Corporation.

Before FISHER and EASTERLY, *Associate Judges*, and KING, *Senior Judge*.

EASTERLY, *Associate Judge*:  In 2010, the District—faced once again with a failing hospital in Anacostia and the specter of tens of thousands of District residents deprived of ready access to medical care—foreclosed on the United Medical Center and turned the property and the operation of the hospital over to the Not-For-Profit-Hospital Corporation.  There were questions about the propriety of the foreclosure (as the District did not own the hospital or the surrounding property outright), and UMC Development, LLC and Jacksophie GSCH, LLC (collectively "the developers") sued.  The theory of their case was that foreclosure was wrongful, and that by foreclosing, the District had injured their right to develop the property.

The developers' right to develop the property was itself subject to question.  They had agreements with third parties (who in turn had their own deals with the District) in which it was envisioned that the District would approve the third parties' transfer of title to the developers.  But the District never gave its approval.  The Superior Court thus ruled that the developers lacked standing to challenge the foreclosure.  The court also ruled that the developers had failed to satisfy the notice requirements of D.C. Code § 12-309 (2012 Repl.).  The court dismissed all of the developers' claims with prejudice.

The developers now appeal. We affirm the Superior Court's dismissal of all counts, determining that the developers lacked standing to raise any of their claims, and accordingly that this court lacked subject matter jurisdiction to hear them. To the extent that the court dismissed the developers' claims with prejudice, however, we reverse. A lack of subject matter jurisdiction may only properly serve as the foundation for a dismissal without prejudice. Thus, we direct the Superior Court to amend the order accordingly.

## I.      Facts and Procedural History

To give necessary context, our narrative begins in 2007, when United Medical Center's predecessor, Greater Southeast Community Hospital, was in financial distress. As it was the only hospital serving the approximately 140,000 District residents east of the Anacostia River, its troubles were of great concern to the District. In October 2007, the Council of the District of Columbia enacted the "East of the River Hospital Revitalization Emergency Amendment Act of 2007."[1] The Act created a private-public limited partnership between the District and Specialty Hospitals of Washington-GSE Holdings, LLC ("SHW"), to purchase the

---

[1] D.C. Act No. 17-168, 54 D.C. Reg. 10978 (Oct. 19, 2007).

failing hospital with up to $79 million in public funds. Pursuant to the District-SHW Partnership Agreement, subsequently executed on November 7, 2007, the District was designated the Limited Partner, and SHW the General Partner. Notwithstanding its designation as General Partner, SHW's powers were constricted. Specifically, it neither had the authority to "obligate, bind[,] or commit the Limited Partner in any way for any obligation," nor to "cause the Partnership to sell, transfer[,] or otherwise dispose of any property or assets in a single transaction or series of related transactions," without first obtaining prior written approval of the Limited Partner.

Just before the District-SHW Partnership was established, SHW's parent company created two entities: Capitol Medical Center, LLC and CMC Realty, LLC (collectively, "the CMCs"). The District-SHW Partnership entered into an Acquisition Loan Agreement with the CMCs, by which it loaned them money for the purchase and ownership of the hospital and development land, as well as the operation of the hospital. The Acquisition Loan Agreement directed that CMC Realty, as purchaser and owner of the hospital and development land, "shall not . . . [d]ispose, convey, transfer, license the use of, or encumber, [n]or permit the conveyance, transfer or encumbrance of, any part of the Property" "[w]ithout [the Partnership's] prior approval (which may be given or withheld in [the

Partnership's] sole and absolute discretion)." The loan was secured by a deed of trust that conferred on the District-SHW Partnership a right to foreclose on the property.

Meanwhile, SHW, on its own and without the participation of the District, engaged in other business dealings related to the hospital and the development land. On November 5, 2007, two days prior to the execution of the District-SHW Partnership Agreement (and thus prior to execution of the Acquisition Loan Agreement between the District-SHW Partnership and the CMCs), SHW entered into an Operating Agreement with Jacksophie to create UMC Development. The UMC Development Operating Agreement anticipated that CMC Realty, after acquiring the hospital and development land, would transfer the development land to UMC Development for the subdivision, development, and operation of the land. The UMC Development Operating Agreement, however, also acknowledged that CMC Realty would be bound to "the terms and conditions of the Acquisition Loan Agreement" between it and the (anticipated) District-SHW Partnership. In March 2008, CMC Realty twice requested permission from the District to transfer title of the development land to UMC Development. The District declined to approve the transfer.

By 2010, the hospital had once again become financially unstable, prompting the District to initiate foreclosure of the hospital and development land. It then purchased the property at the foreclosure sale in July, and soon thereafter transferred the hospital and the development land to a new, statutorily-created entity, Not-For-Profit-Hospital Corporation.[2]

The developers filed a complaint in Superior Court against the District and Not-For-Profit-Hospital Corporation as well as Mayor Gray, SHW, and CMC Realty. The developers' complaint centered on the District's decision to foreclose on property which they asserted they owned. In the first paragraph of their complaint, the developers stated that their "action follow[ed] the District's wrongful foreclosure on the United Medical Center . . . and its surrounding real property (the '[d]evelopment [l]and') and the improprieties that tainted those proceedings." In the second paragraph the developers referred to agreements they had made, which allegedly assured that UMC Development would "becom[e] the rightful owner of the development land[,] as was known, understood and agreed to by the District and CMC Realty," and further alleged that, "[k]nowing that it had no authority to foreclose on the development land, in 2010, the District purported

---

[2] *See* D.C. Code §§ 44-951.01–.18 (2012 Repl.).

to exercise rights that it did not actually hold, and wrongfully foreclosed on the [d]evelopment [l]and at the direct expense of the developers." In the third paragraph the developers asserted even more explicitly that, "[a]t the time of the District's purported foreclosure, UMC Development was the rightful owner of the Development Land as known to and approved by the District and acknowledged by D.C. Courts." The developers then alleged that, "[a]s a result of the District's actions," i.e., the foreclosure, they were "effectively stripped of any and all . . . rights to this valuable land."[3] The developers subsequently enumerated seven state-law claims against the District.[4] Five of these claims explicitly linked their injury to the foreclosure,[5] and the two that did not incorporated by reference prior allegations that identified the foreclosure as the source of their injury.[6]

---

[3] This assertion notwithstanding, the developers acknowledged in their complaint that CMC Realty had written two letters to the District requesting permission to transfer title in the development land, but that the District "did not approve [such] transfer."

[4] We focus on the state law claims pled against the District because the developers' constitutional claims against the District were removed to federal court, *see* note 7, *infra*, and because the District, Mayor Gray (in his official capacity), and Not-For-Profit Hospital Corporation are the only appellees before us. Moreover, there is no need to discuss separately the claims against Not-For-Profit Hospital Corporation because the developers have not challenged the Superior Court's ruling that these claims were entirely derivative of the claims against the District. *See* note 10, *infra*.

[5] Count I (wrongful foreclosure), Count II (specific performance of the Operating Agreement), Count III (tortious interference with prospective economic

(continued…)

The District responded by filing a motion to dismiss[7] that, among other things, disputed the developers' ownership or any other legally cognizable interest in the land and generally contested the developers' standing to challenge the foreclosure or to raise any of the claims in their complaint. The District argued that the developers at most had a "future, conditional, property interest for which the necessary conditions were never fulfilled," and that the developers suffered no injury to this interest by virtue of the foreclosure. Rather, "the real impediment to the ability to undertake development activities vis-à-vis the [d]evelopment [l]and was CMC Realty's inability to procure the necessary approval to transfer the [d]evelopment [l]and to UMC Development." To substantiate its standing challenge, the District attached to its pleading copies of documents referenced in (but not attached to) the developers' complaint, namely, the District-SHW Partnership Agreement, the Acquisition Loan Agreement, and the UMC Development Operating Agreement.

_____

(…continued)
advantage), Count IV (breach of contract (third party beneficiary)), and Count IX (constructive trust, the development land).

[6] Count VIII (unjust enrichment) and Count X (quantum meruit).

[7] This motion was originally filed in federal court after the District successfully removed the case to the United States District Court for the District of Columbia. It was re-filed after the developers' state law claims were remanded back to the Superior Court.

In their opposition to the District's motion to dismiss, the developers acknowledged that "[o]ne theme permeates the District's entire motion: its recurring refrain that Plaintiffs lack a property interest sufficient to ground any complaint." In response, the developers retreated from their assertion of "ownership." Instead, the developers asserted that the District had "enlisted and engaged" them "as commercial real-estate developers"; that it had "tapped [them] to play an essential role in developing [the hospital] property"; and that, as they "proceeded accordingly, per written contracts that the District presided over and blessed," the District "repeatedly encouraged [them] onward[,] and assured them . . . that their investments and resulting rights would be recognized and rewarded, per agreement and understanding." Even as the developers revised some of their factual allegations, however, they did not retreat from their assertion that the foreclosure was the source of their injury. They asserted that, "although [they] did everything that was asked of them for the benefit of the District . . . . [t]he District reneged on the deal and denied the [developers] the benefit of the bargain struck based on one thing and one thing only: [the District's] unilateral decision to foreclose on the Hospital and the Land."[8]

---

[8] Elsewhere in their opposition, the developers similarly asserted that foreclosure was the "only impediment" to UMC Development's full ownership, and that UMC Development's interests in the development land were "destroyed" by foreclosure; that "formal approval [of title transfer] was wrongfully withheld by

(continued…)

The Superior Court understood that the District's standing challenge was broadly directed at all claims the developers made against the District. Indeed, the court noted in its standing analysis that the allegation that the District "wrongfully foreclosed upon the [development] property . . . effectively stripp[ing] the plaintiffs of any and all . . . rights to this valuable land . . . . is the underpinning of all of plaintiffs' claims." The court ruled that this theory did not give the developers standing because the "injury plaintiffs claim was not caused by the . . . foreclosure, even if that foreclosure was wrongful," and relatedly, "any injury suffered by plaintiffs will not be redressed if the court were to declare the foreclosure wrongful."[9] But the court ultimately ruled that only Counts I-IV & IX, *see* note 5, *supra*, should be dismissed as to the District on this ground; it dismissed

---

(…continued)

the District via its wrongful foreclosure," which it characterized as the District's "ultimate and sole mechanism for declining to approve the transfer"; that the developers were "slated to develop the [l]and at issue and to receive formal transfer of title as a matter of course, but for the District's wrongful foreclosure now at issue"; that the District "stood upon the wrongful foreclosure as its only basis for denying [the developers] title and other valuable rights"; and that the District "rendered valuable rights to develop the land altogether valueless when it purported to extinguish them pursuant to its . . . foreclosure."

[9] Although the Superior Court found that the developers had solely challenged the foreclosure and had not separately challenged the District's refusal to approve the developers' acquisition of the development property, it also determined, in the alternative, that "even if [the developers] had pled the District's refusal to approve the conveyance" of the development property, "sovereign immunity would bar any claims based on the District's refusal to approve their acquisition of the development property."

the remaining two claims against the District, Counts VIII and X, *see supra* note 6, because the developers had failed to provide the District with notice pursuant to D.C. Code § 12-309.[10]

## II. Analysis

On appeal, the developers argue that they did in fact have standing to sue. "Whether appellants have standing is a question of law which we consider on appeal *de novo*." *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 705 (D.C. 2009) (internal quotation marks omitted).

"Standing is a threshold jurisdictional question which must be addressed prior to and independent[ly] of the merits of a party's claims."[11] Although the District of Columbia courts were created under Article I of the U.S. Constitution, we generally adhere to the case and controversy requirement of Article III, and

---

[10] The Superior Court dismissed the claims against Not-For-Profit-Hospital Corporation as well, explaining that "[i]f plaintiffs are not entitled to relief against the District, *a fortiorari* they are not entitled to relief against Not-For-Profit." The claims against SHW and CMC Realty were subsequently dismissed in May 2014, pursuant to the terms of a private settlement.

[11] *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc) (internal quotation marks omitted).

look to federal standing jurisprudence when considering the issue of a plaintiff's standing.[12]  To satisfy the requirements of "constitutional" standing, a plaintiff in our local courts must adequately allege that (1) she suffered an injury in fact, (2) the injury is fairly "traceable to the defendant's action," and (3) the injury will likely be "redressed" by a favorable decision.[13]  A "defect of standing is [likewise] a defect in subject matter jurisdiction."[14]  Thus, a challenge to a plaintiff's standing is properly raised as a challenge to the court's subject matter jurisdiction via a motion to dismiss under Super. Ct. Civ. R. 12 (b)(1).

The plaintiff bears the burden to establish standing.[15]  In our *en banc* decision in *Grayson*, this court said that when a plaintiff's standing is called into question, the facts in the complaint must be accepted as true and must be

---

[12]  *District of Columbia Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec., & Banking*, 54 A.3d 1188, 1199-1200 (D.C. 2012); *accord Padou v. District of Columbia Alcoholic Beverage Control Bd.*, 70 A.3d 208, 211 (D.C. 2013); *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011); *Grayson*, 15 A.3d at 233-35.

[13]  *Daley*, 26 A.3d at 728-29 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[14]  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)); *accord*, *Grayson*, 15 A.3d at 247 (holding that one plaintiff's claim was properly dismissed for want of subject matter jurisdiction where he failed to demonstrate he had standing to bring suit).

[15]  *Grayson*, 15 A.3d at 246.

"construe[d] . . . in favor of the complaining party."[16] But we also acknowledged that a trial court's jurisdictional inquiry under Rule 12 (b)(1) may extend beyond the facts pled in the complaint.[17] Thus, when a defendant makes a "factual" (as opposed to a "facial") attack on the plaintiff's complaint under Super. Ct. Civ. R. 12 (b)(1),[18] the trial court may "conduct an independent review of the evidence submitted by the parties, including affidavits, to resolve factual disputes concerning whether subject-matter jurisdiction exists."[19] In *Grayson*, this court

[16] *Id.* at 232 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

[17] *Id.* at 232 n.28 ("[I]t has long been accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on authority to entertain the case.") (quoting *Haase*, 835 F.2d at 906).

[18] *Heard v. Johnson*, 810 A.2d 871, 877-78 (D.C. 2002).

[19] *Matthews v. Automated Bus. Sys. & Servs., Inc.*, 558 A.2d 1175, 1179 (D.C. 1989). *See Grayson*, 15 A.3d at 232 (observing that "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing") (quoting *Warth*, 422 U.S. at 501, and citing *Haase*, 835 F.2d at 806).

We explained in *Matthews* that, unlike in the 12 (b)(6) context, "[t]he submission of affidavits . . . does not convert a Rule 12 (b)(1) motion to one for summary judgment." 558 A.2d at 1179. Rather, "the determination of jurisdictional facts is [generally] a matter for the court, . . . and the court has broad discretion in determining how to proceed in finding such facts, including basing its decision on affidavits." *Id.* at 1179-80 (citations omitted); *see Heard*, 810 A.2d at 878 (stating that a "factual" attack on the court's jurisdiction under Rule 12 (b)(1) "may occur at any stage of the proceedings[,] and plaintiff bears the burden of proof that jurisdiction does in fact exist. Perforce, no presumptions of truthfulness adhere to the allegations of the complaint" (internal citations and quotation marks omitted)).

suggested that a court should not resolve factual disputes without holding an evidentiary hearing.[20]  We have never questioned, however, a trial court's consideration of facts outside the pleadings that are undisputed by the plaintiff.[21] Such is the scope of a trial court's review, and "[i]f . . . the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."[22]

For the reasons set forth below, we conclude that the developers did not establish that they had standing to sue on any of their claims.  We consider and find wanting the standing argument that the developers ultimately settled on in Superior Court.  We acknowledge that the developers have sought to advance alternative standing arguments on appeal; but these were not claims they advanced

---

[20]  15 A.3d at 232.  We noted that "[s]ome federal circuits have determined that a district court *cannot* decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but *must* hold an evidentiary hearing," and that "[t]his practice is consistent with the Supreme Court's pronouncement in *Warth*," which we favorably cited throughout *Grayson.  Id.* (internal quotation marks omitted).

[21]  *See, e.g.*, *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Wash., D.C. v. Beards*, 680 A.2d 419, 430 (D.C. 1996) (relying on an uncontested affidavit presented by the defendants to decide a factual attack under Rule 12 (b)(1)); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record.").

[22]  *See Grayson*, 15 A.3d at 232 (quoting *Warth*, 422 U.S. at 502).

or supported below, and we hold that the developers may not on appeal rewrite the record they created below.[23] Thus we conclude that the Superior Court properly dismissed the developers' complaint; however, because the court lacked subject matter jurisdiction over all the developers' claims, the appropriate remedy was dismissal without prejudice.[24]

---

[23] The developers suggested at oral argument that, since standing may be raised as an issue at any time, they could inject new facts to support their standing at any time. But, where, as here, the developers' standing was challenged in the District's motion to dismiss, the time and place for factual development was in the litigation of that motion in the Superior Court.

Furthermore, we reject the developers' argument that they were given insufficient opportunity "to address and fill any perceived gaps in the[ir] allegations." The developers assert that, following remand of the case to Superior Court, they were "never invited [to submit] further briefing," on the District's already fully briefed standing challenge, and that they expected the Superior Court to hold a hearing on the District's motion to dismiss before ruling. But in the four months that the District's motion to dismiss was pending in Superior Court post-remand, the developers never asked to submit further briefing on the issue of standing or for an evidentiary hearing (although they did file supplemental pleadings addressing unrelated issues). Nor did they, after the court ruled that they lacked standing, seek reconsideration under Super. Ct. Civ. R. 59 or 60 and ask for a hearing in conjunction with that motion. As noted above, the developers bore the burden of proof to establish their standing to sue; if they wanted additional opportunity to develop evidence or present their arguments, it was their obligation to request it.

[24] We emphasize that we are not deciding the merits of this dispute. In particular, we do not decide whether the District wrongfully foreclosed on the property. Nor do we decide whether the developers in fact suffered any injury. We merely conclude that the developers did not succeed in demonstrating in Superior Court that they have standing to pursue their claims as pled in their complaint.

### 1. The standing argument the developers advanced in Superior Court

We begin our analysis by examining the developers' precise interest in the development land as pled in Superior Court. The developers initially asserted in their complaint that they were, pursuant to certain written agreements, the rightful owners of the land and had been injured by the wrongful foreclosure. But they abandoned that claim when the District moved to dismiss and attached the relevant agreements to its motion. In their opposition to the District's motion to dismiss, the developers never argued that the Superior Court had to disregard these attachments and rely solely on the developers' representation of the rights created by these documents as pled in the complaint. Rather, in their opposition, the developers affirmatively relied on the District-SHW Partnership Agreement supplied by the District. Equally important, the developers substantially scaled back their description of their interest in the property and explicitly acknowledged that, as these documents reflected, they only had a contingent future interest in the development land.[25]

---

[25] Having devoted pages of their pleading to their explication of their future contingent interest in the property, on which they based their standing, the developers reminded the court that "in any event" they had pled in the complaint that they "were in actuality the rightful owners." But once the developers admitted that they only had an expectation of transfer of title, the Superior Court was no longer obligated to credit that bare assertion, nor did the court have an obligation to

(continued…)

Pursuant to the UMC Development Operating Agreement, the developers had a pledge from CMC Realty that it would convey title to the development land to UMC Development. This pledge was made before CMC Realty had the land to give and was limited by "the terms and conditions of the Acquisition Loan." The subsequently executed Acquisition Loan Agreement between CMC Realty and the District-SHW Partnership required the latter's "prior approval (which [could] be given or withheld in [its] sole and absolute discretion)," before CMC Realty could dispose, convey, transfer, license the use of, encumber, or permit the conveyance, transfer, or encumbrance of any part of the property. The District-SHW Partnership Agreement in turn provided that the District and the District alone had the authority to control the sale of the property, at least for ten years. Thus, UMC Development's interest (and by extension Jacksophie's interest) was a contingent future interest that could not mature into an actual present interest without the District's consent to the transfer of title from CMC Realty to the developers— consent which the District had no obligation to CMC Realty, or the developers, to give.

---

(…continued)
schedule an evidentiary hearing *sua sponte* on this undisputed issue of fact before ruling on the District's Rule 12 (b)(1) motion.

The allegations of the developers' complaint, and the documents on which they relied in an effort to demonstrate standing, failed to connect the foreclosure to their loss of this contingent future interest, and thus failed to satisfy the traceability element of standing. To begin with, the contingent future interest in the transfer of title appears to have been lost long before the foreclosure. As the developers acknowledged in the complaint, only four months after the UMC Development Operating Agreement was signed, CMC Realty twice requested that the District approve a transfer of title to UMC Development. The District denied the request. Another two years passed before the District foreclosed.

The developers argue, however, that they continued to receive assurances from the District that transfer of title would eventually be approved. Such assurances are nowhere to be found in the developers' recitation of facts in their complaint and are at best only vaguely alluded to in one paragraph of Count II seeking specific performance of the UMC Development Operating Agreement (to which the District was not a party). But assuming, for the sake of argument, these assurances were adequately pled, we still cannot trace the developers' loss of their contingent future interest to the foreclosure. The key point is that the District never consented to transfer title to the developers. Even after the foreclosure, the District still could have done so. By means of the foreclosure the District had

exercised (rightfully or wrongfully) ownership rights in the property, and conceivably it could have given UMC Development title directly. Instead, it charted a different course, created the Not-For-Profit-Hospital Corporation, and conveyed the property to that newly established entity. In other words, the District unambiguously and definitively demonstrated its disinterest in fulfilling the contingency on which the developers' property interest was based both before and after the foreclosure.[26]

Having determined that the developers did not demonstrate that any injury they suffered was traceable to the foreclosure on the hospital by the District, we need not analyze whether the developers' alleged injuries constituted an injury in

---

[26] We are likewise unpersuaded by the developers' argument that their injury was traceable to the foreclosure because CMC Realty remained contractually obligated to convey the development land to UMC Development under the Operating Agreement and the District would have been compelled to negotiate with UMC Development "in order to obtain unclouded title and rights" to the development land. This argument simply ignores both the provisions in the UMC Development Operating Agreement, which acknowledged that the Loan Acquisition Agreement was controlling, and the provision in the Loan Acquisition Agreement, which left the decision whether or not to withhold consent to any request by CMC Realty to transfer title "in [the District-SHW Partnership]'s sole and absolute discretion."

fact, nor whether the injury would be redressed by a favorable decision, under the first and third required elements of standing.[27]

## 2. The developers' standing argument on appeal

The developers' standing argument has evolved on appeal. They now argue that their interest in the hospital property, at least in part, was not merely contingent or future, but also grounded in their actual receipt of "development fees, rental payments, and other profit," income which was cut off with the foreclosure. The record does not support their argument.

In addition to UMC Development's contingent future interest in title to the development land, the developers assert that they pursued a theory of standing in

---

[27] The developers also argued that they had standing to sue because they lost the chance to either "profit from" or participate in the foreclosure auction. The first assertion appears to be based on an ownership right they did not possess, and a contingent future interest that was, by that time, defunct. Likewise, their second assertion, a generalized grievance that the auction (in which they did not participate) was rigged, does not give them standing to challenge the foreclosure sale. *See Lujan*, 504 U.S. at 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not [have standing to sue].").

Superior Court based on assertions that UMC Development was already earning, and had the "right to earn development fees, rental payments, and other profit" from its development of the land, *irrespective of whether they held title*" at the time of the foreclosure. The developers point to a sentence in the "Factual Background" of their complaint, in which they noted that they "had every reasonable expectation of deriving fair returns on their investment and contributions over the course of the ensuing life of the property, which was expected to appreciate in value and to throw off continuing returns over the course of decades." Whereas the developers place great weight on the phrase "continuing returns" as proof that they had argued that they had already "been collecting rental income from the [d]evelopment [l]and prior to the foreclosure," we cannot ignore the word, "expectation." We further note that there is no mention of any "rental income," let alone *existing* rental income that was cut off by the foreclosure. There is also no discussion of any alleged "development interests" that existed independent of the developers' anticipated receipt of title.

Apart from their complaint, the developers direct our attention to their opposition to the District's motion to dismiss, to which they appended their memorandum of points and authorities in opposition to then-defendants SHW's and CMC Realty's separately litigated motion to dismiss. Specifically, they

include in their brief a citation to this other pleading, with the explanatory parenthetical: "describing some of the rental payments." This court cannot find where the developers asked the Superior Court to consider this other pleading—directed to a different motion filed by different defendants, raising different issues[28]—as support for an argument that they were actually receiving rental income from the development land prior to the foreclosure and thus had standing to sue the District. But, in any event, in this other twenty-four-page pleading, we see only a single possibly relevant sentence in which developers noted that they had sued SHW and CMC Realty in a 2009 lawsuit "for failing to account for and remit to [the developers] certain rental payments arising from a leasehold interest held by SHW[] and CMC Realty." As this sentence indicates only that SHW and CMC held "leasehold interests" in the property, it fails to substantiate the developers' assertion on appeal that, because of the foreclosure, they were deprived of an active stream of rental income.

---

[28] The developers' Opposition to SHW's and CMC Realty's motion to dismiss responded to arguments that (1) the developers' claims were time-barred, (2) the developers' claims were barred by *res judicata*, and (3) the developers had failed to state a claim against SHW for (a) tortious interference with prospective economic advantage or (b) breach of fiduciary duty.

### 3.  Lack of standing undermines all the developers' claims

The Superior Court determined that it did not have subject matter jurisdiction to hear Counts I through IV, nor Count IX, but dismissed Counts VIII (unjust enrichment) and X (quantum meruit) on other grounds.[29]  We conclude, however, that the developers lacked standing to bring all of their claims, and that dismissal of the developers' complaint may be affirmed on that basis.[30]

---

[29]  The Superior Court dismissed these claims for the developers' failure to provide notice under D.C. Code § 12-309, which requires plaintiffs bringing an action "against the District of Columbia for unliquidated damages to person or property" to, "within six months after the injury or damage was sustained," give "notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the alleged injury or damage."

[30]  *See Randolph*, 973 A.2d at 705 (noting that where our review is *de novo*, "we are not limited to reviewing the legal adequacy of the grounds the trial court relied on for its ruling; if there is an alternative basis that dictates the same result, a correct judgment must be affirmed on appeal" (quoting *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1176 n.9 (D.C. 2008))); *Gov't Emps. Ins. Co. v. Grp. Hospitalization Med. Servs., Inc.*, 602 A.2d 1083, 1086 (D.C. 1992); *see also Riverside Hosp. v. District of Columbia Dep't of Health*, 944 A.2d 1098, 1103 (D.C. 2008) ("Questions of standing may be raised *sua sponte* by this . . . court.").

We take no position on the developers' obligations under § 12-309.  Indeed, we find we cannot, because timely notice under the statute is tied to injury, *see supra* note 29, and, as explained above, we cannot identify an injury traceable to the District.

The injury the developers allegedly endured under the theories of unjust enrichment and quantum meruit[31] was, in essence, the unfairness of the District benefiting from the developers' vaguely asserted "significant pre-development investment[s]," and its undertaking of "significant and valuable pre-development efforts and services" without receiving compensation. Since the developers never explained with any specificity what these pre-development investments or efforts and services were, it is unclear how the District benefitted from them or how the developers were deprived of something of value. But our focus is not on whether the developers failed to state claims for unjust enrichment and quantum meruit. Whatever these investments or efforts and services were, the developers' only attempt to connect their injury to the actions of the District, with these claims as with all others, was to point to the District's foreclosure of the hospital and development land. In the complaint, the developers asserted that the District

---

[31] An unjust enrichment claim requires the plaintiff to demonstrate that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Euclid St., LLC v. District of Columbia Water & Sewer Auth.*, 41 A.3d 453, 463 n.10 (D.C. 2012) (internal quotation marks omitted).

A quantum meruit claim requires the plaintiff to demonstrate that (1) valuable services were rendered by the plaintiff; (2) for the defendant; (3) that said services were accepted and enjoyed by the defendant; and (4) under such circumstances has reasonably notified the defendant that the plaintiff, in performing such services, expected to be paid. *New Econ. Capital, LLC v. New Markets Capital Grp.*, 881 A.2d 1087, 1095 (D.C. 2005) (citing *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C. 1996)).

claimed "valuable benefits . . . for itself when it acquired the [d]evelopment [l]and" via foreclosure; and in their opposition to the District's motion to dismiss, the developers allege "that the District knew at the time specifically that (1) its foreclosure was wrongful; and (2) it was thereby injuring" the developers.

However, the injuries claimed in Counts VIII and X, as with the rest, could not have been a result of the foreclosure. The benefit of the developers' pre-development investments (if any) was wrongfully "retain[ed]," and "accepted and enjoyed" by the District, to the developers' detriment, when the District did not approve CMC Realty's request to transfer title (which the District had no obligation to do).[32] We thus affirm dismissal of Counts VIII and X, determining that the developers lacked standing to bring these claims and the Superior Court thus lacked subject matter jurisdiction to hear them; we need not and do not address the developers' challenges to the Superior Court's finding that their unjust enrichment and quantum meruit claims were barred by both sovereign immunity and D.C. Code § 12-309.

---

[32] It was not necessary for the District to foreclose to enjoy these alleged benefits. The District's interest in the hospital and surrounding land was not based upon its legal possession of the property, but rather, as the developers acknowledge, in having a functional, financially stable hospital to serve the 140,000 District residents east of the Anacostia River.

### 4. Dismissal without prejudice

While it was proper for the Superior Court to dismiss all the counts in the developers' complaint, the dismissal should have been made without prejudice. Where a litigant lacks standing to pursue his claims, the defect is one of subject matter jurisdiction. *See supra* note 14. Such defects may only result in a dismissal without prejudice.[33] In other words, a court which lacks subject matter jurisdiction may not issue a ruling on the merits.[34]

---

[33] 9 Wright & Miller, Fed. Prac. & Proc. § 2373 (3d ed. 2008) (noting "that dismissals that do not reach the merits because of a lack of jurisdiction, because the action was premature, or because it was brought by the wrong plaintiff, must be considered to have been dismissed without prejudice" (footnotes omitted));

[34] *See, e.g.*, *In re Brown*, 974 A.2d 884, 886 (D.C. 2009) ("We do not reach the merits of the appeals because we lack subject matter jurisdiction. Therefore, we dismiss the instant appeals without prejudice to possible future challenges after [the defect is cured]."); *Simmons v. Cent. Charge Serv., Inc.*, 269 A.2d 850, 852 n.7 (D.C. 1970) ("Dismissal of appellant's complaint for lack of jurisdiction . . . will not, of course, prejudice her should she file a new complaint with proper jurisdictional allegations."); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits."); *see also Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cty., Okla. v. City of Guthrie*, 654 F.3d 1058, 1069 n.9 (10th Cir. 2011); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006); *Murray v. Conseco, Inc.*, 467 F.3d 602, 605 (7th Cir. 2006); *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004); *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 182 (3d Cir. 1999); *cf.* Super. Ct. Civ. R. 41 (b) (noting, in discussion of the effect of involuntary dismissals, that "a dismissal

(continued…)

The lack of subject matter jurisdiction likewise precludes us from determining that the court's decision to dismiss with prejudice was error, but harmless, as the District urges us to do. Having concluded that the Superior Court lacked subject matter jurisdiction to hear the developers' claims, we cannot reach beyond that determination to consider whether those claims would be meritorious if the defect in standing were cured—that is, were the developers' complaint dismissed without prejudice and were they to utilize the opportunity (assuming such opportunity still exists) to file a new complaint.[35] Moreover, in this case, where no motion to amend the complaint was filed, it would be entirely speculative and thus unwise for us to make such a peremptory ruling.[36]

Our decision in *Dorsey v. District of Columbia*, 839 A.2d 667 (D.C. 2003), on which the District relies, is not to the contrary. In that case, we determined that

---

(…continued)
under this subdivision and any dismissal not provided for in this Rule, *other than a dismissal for lack of jurisdiction*, . . . operates as an adjudication upon the merits" (emphasis added)).

[35] *See, e.g.*, *Brereton*, 434 F.3d at 1217 ("[O]nce a court determines it lacks jurisdiction over a claim, it perforce lacks jurisdiction to make any determination of the merits of the underlying claim." (citations omitted)).

[36] *Cf. Brereton*, 434 F.3d at 1219 (where trial court lacked subject matter jurisdiction due to its determination that plaintiff lacked standing, it was error for the trial court to dismiss the case with prejudice because it thought it would be futile to grant the motion to amend).

"the trial judge did not commit reversible error in dismissing Dorsey's complaint with prejudice" where "any re-filed complaint would not have been viable because . . . the statute of limitations period governing Dorsey's claim expired three days after the complaint was filed." *Id.* at 669. Unlike here, the trial court in *Dorsey* dismissed the case for failure to serve counsel for the District, i.e., for failure to comply with court rules. Although mandatory, rules regarding service do not implicate the court's subject matter jurisdiction.[37] *Dorsey* thus does not support the District's argument that any error in dismissing this case with prejudice was similarly harmless.

For the foregoing reasons, we affirm the Superior Court's order dismissing the developers' suit in its entirety, but we reverse to the extent that the order dismissed the developers' claims with prejudice. We remand to the Superior Court to amend its dismissal order accordingly.

*So ordered*.

---

[37] *See Neill v. District of Columbia Pub. Emp. Relations Bd.*, 93 A.3d 229, 239-40 (D.C. 2014) (distinguishing the concepts of subject matter jurisdiction and service of process).