*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0262

RE'ESE ADBARAT DEBRE SELAM KIDEST MARIAM ETHIOPIAN
ORTHODOX TEWAHEDO CHURCH, INC., APPELLANT,

V.

AKLILU HABTE, MARTHA KASSA ENGIDA, METENU TESFA,
TEZAKU D. TEGENE, ELIAS MEAZA, KASSA T. BIRU, BEZA ASRAT TADESSE,
GIRMA TIRUNEH, TESFAYE ASSEGED, ADDISU ABEBE, MENGESHA ACHAME,
TADELE G. WOLDE, ABRAHAM HABTIE SELASSIE, AMEHA DESTA,
ZELALEM ANTENEH HABTE, and HAILU ZELEKE LEBU, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2015-CA-007574-B)

(Hon. John M. Mott, Trial Judge)

(Argued November 16, 2022                    Decided August 31, 2023)

*George L. Lyon, Jr.*, with whom *Robert N. Kelly* was on the brief, for appellant.

*Donald L. Thompson*, with whom *T. Michael Guiffré*, was on the brief, for appellees.

Before BECKWITH and MCLEESE, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

---

[*] Judge Glickman was an Associate Judge at the time of argument.

GLICKMAN, *Senior Judge*:  This appeal arises from disputes between members of the Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church over the governance of the Church by its Board of Trustees.  In October 2015, the Board filed a Superior Court lawsuit in the name of the Church against parishioners who were challenging the Board's leadership and the elections of Trustees to the Board in July 2014 and March 2015.  The complaint sought declaratory and injunctive relief against the dissidents, including a judgment affirming the validity of the two Board elections they contested.

In 2016, while the lawsuit was still pending, the Church conducted two more elections to its Board of Trustees.  The first was in March 2016 and was held to fill the positions of the four Trustees elected in 2014, whose two-year terms were due to expire.  Subsequently, however, in a decision denying the plaintiff's motion for preliminary injunctive relief, the trial court ruled that the 2014 and 2015 elections had been conducted in violation of the applicable Church Bylaws.  This ruling implied the likely invalidity of the March 2016 election as well.  Although the ruling denying interim relief was not a final determination of the issues for purposes of the litigation, it led the Church to conduct a new election for the full Board of Trustees in October 2016.  That election resulted in the replacement of all the elected Trustees on the Board by new ones.

Three months later, in January 2017, the newly reconstituted Board voted to dismiss the Superior Court lawsuit. Based on that vote, the defendants filed a motion to dismiss the suit on the ground that the persons bringing it lacked standing to maintain it in the name of the Church following the election and decision of the new Board. The Superior Court granted the motion to dismiss over the plaintiff's objection that the October 2016 election itself was invalid because there were no vacancies on the Board at that time. This objection was premised on the asserted validity of the preceding Trustee elections (despite the earlier non-final ruling to the contrary), in which all the seats on the Board had been filled (and remained filled as of October 2016). The Superior Court granted the defendants' motion and dismissed the complaint without definitively ruling on that precise issue. In the ensuing appeal, however, this court vacated the judgment and remanded for further proceedings to determine conclusively whether the earlier elections were invalid and whether there actually were vacancies on the Board that could be filled in October 2016.[1]

On remand, the Superior Court found that the Trustee elections held in 2014, 2015, and March 2016 suffered from flaws that rendered each of them invalid.

---

[1] *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, No. 18-CV-0559, Mem. Op. & J. at 7 (D.C. Aug. 22, 2019).

Accordingly, the court reaffirmed its dismissal of the lawsuit in the name of the Church for lack of standing.

In the present appeal from that dismissal, the plaintiff-appellant — nominally, the Church — argues that the Superior Court erred in each of its findings of electoral invalidity. For the reasons we explain in this opinion, we conclude that the court did commit errors requiring us to vacate its order dismissing the complaint and to remand the case again for further proceedings.

## I. Background

Appellant is a Church founded in 1987 and incorporated as a nonprofit organization under District of Columbia law. Bylaws adopted in 1996 provide that the Church is "governed by a Board of Trustees elected by the General Assembly" of the parishioners. The Board of Trustees is composed of eleven members: the founder of the Church, who is a permanent member of the Board; the Church administrator (called the Aleka), who serves as an ex officio Board member; eight members who are elected by the General Assembly; and one member who is elected by the clergy. The eight Trustees chosen by the General Assembly are elected to two-year terms, which are staggered to elect half of them each year so that their terms do not all end at the same time.

The 1996 Bylaws require the General Assembly to convene "once a year in the month of October." The Board is empowered to call emergency meetings of the General Assembly at other times on at least 24 hours' notice. In general, the presence at a General Assembly session of "one-third of the total number of registered members" constitutes a quorum, but "[w]here for any reason a quorum cannot be obtained at such meeting, a second meeting shall be called within two weeks at which the presence of any registered members shall constitute a quorum." A quorum of two-thirds of the members is required, however, "for a meeting called to amend" the Bylaws. Most decisions of the General Assembly are made by "the affirmative vote of a majority of the members present at a duly called meeting," but amendment of the Bylaws requires "an affirmative vote of not less than two-thirds of the members in a General Assembly." The 1996 Bylaws state that Church members "shall have the right to vote on all matters brought before the parishioners, provided that in order to elect members of the Board and other officials of the Church, members shall have been financial contributors of record for at least six months preceding any such elections."

In 2012, the Board called three meetings of the General Assembly to vote on replacing the 1996 Bylaws with a new set of bylaws containing different provisions governing Church and Board membership and other matters. Attendance at each of

those meetings fell short of two-thirds of the General Assembly. As a result, and as this court subsequently held in the Church's previous appeal, the proposed 2012 Bylaws did not achieve the vote required for them to take effect and supersede the 1996 Bylaws.[2] However, the Board of Trustees viewed or treated the 2012 Bylaws as having been adopted at the third meeting, which took place in June 2012, in determining such matters as the eligibility of Church members to vote in a General Assembly meeting.

There followed a two-year hiatus in which the General Assembly did not elect anyone to the Board of Trustees.[3] But in July 2014, the General Assembly met again for the purpose of voting on nominees to fill four elected seats on the Board.[4] In compliance with the supposedly adopted 2012 Bylaws, only parishioners who had paid monthly dues to the Church in each of the preceding six months or had been

---

[2] *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, No. 18-CV-0559, Mem. Op. & J. at 7 (D.C. Aug. 22, 2019).

[3] In July 2012, the General Assembly voted to postpone elections to the Board indefinitely and extend the terms of the Trustees then on the Board. No election was held until July 2014.

[4] The vote was scheduled for July 13, 2014, but due to the absence of a quorum, it was postponed to July 27, 2014.

granted an exemption from that obligation by Church leaders were deemed eligible to vote.

On March 29, 2015, the General Assembly met to elect another four Board members. Eligibility to vote again was determined pursuant to the financial contribution requirements in the 2012 Bylaws. Minutes of the meeting were prepared by the secretary of the Board of Trustees, Wessenyelesh Debela.[5] According to the minutes, the Church had 532 members at the time of the meeting. If that is correct, there needed to be 178 members present for a quorum,[6] and the minutes say that, after counting, there were 178 members present. A contemporaneous report of the Church Committee for Electing the Board of Trustees, which oversaw the election, states that Assembly members were "screened and registered as per the membership list" and that the election was held after "asserting" [sic; presumably, "ascertaining"] that a quorum was present. The report

---

[5] Ms. Debela testified that she prepared minutes of General Assembly meetings in Amharic, and that they later were translated into English. Only the English version was produced in the proceedings below.

[6] The minutes incorrectly state that only 175 members were needed for that purpose. However, Ms. Debela testified that "175" was a typo. She added that issues in the minutes could be resolved by referring to the original Amharic version, except that she did not have the original to refer to.

states that the four candidates who were elected received from 80 to 130 votes (meaning not all of them received a majority of the members present, if it is true that 178 members were in attendance). The report does not specify the number of registered members of the Church or the number of those members present at the meeting.[7]

The report also notes, somewhat cryptically, that Priest Zelalem Anteneh Habte (one of the appellees in this appeal) explained to the General Assembly that he had resigned from the election committee "because [of] 1. Problems with the bylaws, and 2. Because contrary to the resolutions of the board he had distributed ballots to all who asked him for them."[8]

---

[7] The Church's membership lists for the years 2014 and 2015 were not produced in discovery and were not in evidence. Appellant contends it did not have access to these records, but it did not seek to compel their production.

[8] The report goes on to say: "The General Assembly, and this committee, agreed that everyone knew the reasons for his resignation and did not accept them as valid. The meeting continued without any further delays." Earlier in March 2015, Priest Anteneh and two other election committee members had informed the General Assembly in writing that they were suspending their participation on the election committee because of irregularities in the nomination procedures being followed. The irregularities they identified included the provision of nomination forms to "people, whom we did not and could not confirm as members."

In August and September 2015, members of the Church who had been displeased with the Board's leadership began to speak out more vociferously. There were disruptions of Church religious services, and a group called the "Committee of Concerned Church Members" or the "Committee of the Concerned" was formed and met to discuss grievances. After the worship service on September 20, 2015, Committee member (and appellee) Dr. Aklilu Habte declared that Church members had decided to dismiss the eight Trustees elected to the Board by the General Assembly and to replace them with an interim group pending the election of new members by the General Assembly in accordance with the Bylaws. In a meeting that ensued, a majority of the Church's total membership allegedly voted to support the ouster of the eight elected incumbents on the Board.

In response to this turmoil, a majority of the existing Board (with its purportedly ousted members) voted to initiate the present lawsuit in the name of the Church against certain members of the opposing Church faction. The complaint, filed on October 2, 2015, sought a declaratory judgment that "the purported removal of the eight validly elected members of the Board of Trustees [wa]s invalid and that the Board of Trustees continues to be the governing entity of the Church in accordance with its Bylaws"; and it asked for injunctive relief to prevent appellees from "entering the Church premises without the consent of the Church Board of

Trustees" and from "representing themselves as having authority or control over Church premises or property." The plaintiff moved for a temporary restraining order and a preliminary injunction ordering the defendants to relinquish Church property, surrender control of the Church, and cease attending Church services.

The trial court, per Judge Maurice A. Ross, held an evidentiary hearing on the plaintiff's motion for temporary injunctive relief over the course of ten days between October 13, 2015, and May 12, 2016. Meanwhile, the Board of Trustees scheduled and held an election in March 2016 to fill four of the seats on the Board (because the two-year terms of the four Trustees elected in 2014 were expiring). Appellant subsequently submitted to the court a declaration of Girma Tessema, who chaired the committee responsible for conducting the election and preparing the formal "Election Report," and an appended document containing the pertinent minutes of a General Assembly meeting written by the election committee. According to this submission, Church members eligible to vote in the March 2016 election were determined pursuant to the "requirements of the church by-law," but there is no indication which bylaws were followed. The minutes state only that "it was established that 194 members were present" and that "194 members in good standing satisfied the required number for the quorum." No count of the total number of Church members (eligible or otherwise) was provided and no membership list was

attached. The four candidates with the highest number of votes purportedly replaced the Board members who had been elected in July 2014.

On August 29, 2016, Judge Ross denied the motion for temporary injunctive relief. Judge Ross found that none of the requirements for obtaining such relief had been satisfied. In finding that the plaintiff had failed to demonstrate a likelihood of success on the merits of the lawsuit, Judge Ross ruled that the Board members who voted to initiate this lawsuit lacked the authority to do so on behalf of the Church because they were not properly elected to the Board in 2014 and 2015 or had remained on the Board beyond the limits of their terms. Among other things, Judge Ross found that the Board members' elections in 2014 and 2015 were invalid because (1) the 2012 Bylaws had not been properly ratified by the requisite number of members to satisfy the two-thirds quorum requirement of the 1996 Bylaws, and the Church was still governed by the 1996 Bylaws; (2) the restrictive requirements for membership and voting contained in the unapproved 2012 Bylaws were applied in those elections, rather than the less restrictive requirements of the 1996 Bylaws; (3) the quorum requirements of the 1996 Bylaws were not satisfied in either election; and (4) the elections were not held in the month of October, in accordance with the

Bylaw requirement that the annual meeting of the General Assembly be held in that month.[9]

After this ruling, approximately 500 members of the Church signed a petition calling for the election of a new Board. The Church's founder, the only non-elected, permanent Trustee, understood the court's decision to mean he was the only Board member unaffected by it. Through a mediation service, he engaged the services of a neutral party, retired Superior Court Judge Curtis von Kann, to "draft a set of election regulations in strict conformity with the 1996 Bylaws and then observe the election in order to assure that it was carried out in a manner that complied with those regulations."

Appellees submitted a declaration by Judge von Kann describing the process he followed to ensure adherence to the 1996 Bylaws, and the conduct and outcome of the election he personally oversaw. The regulations that Judge von Kann drafted were formally accepted and promulgated by the Church's founder after first having

---

[9] Appellant appealed the trial court's order denying preliminary injunctive relief. This court dismissed the appeal as moot in light of the trial court's subsequent order dismissing the case for lack of standing. *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, No. 16-CV-0990 (D.C. June 20, 2018).

been screened by interested parties (including the parties to this litigation, through their counsel, who raised no objections). The regulations detailed the procedures to be followed for the General Assembly to select a nominating committee and thereafter to elect nominees to the Board of Trustees. For each task, the "first order of business" would be to ascertain whether a quorum (one-third of the Church's registered members) was present "and which of those members [were] financial contributors of record for at least six months preceding the election and . . . thus eligible to vote for Church officials" under Article VI of the 1996 Bylaws.[10]

To prove their membership and eligibility to vote (and determine the presence of a quorum), the regulations required the parishioners to present their Church membership cards (on which their past financial contributions to the Church were recorded) and one other form of identification. Judge von Kann understood this to be the manner in which eligibility determinations "had been traditionally made at this Church." A "registered member" who "ha[d] not made a financial contribution

---

[10] Article VI is the previously mentioned provision in the 1996 Bylaws stating that Church members "shall have the right to vote on all matters brought before the parishioners, provided that in order to elect members of the Board and other officials of the Church, members shall have been financial contributors of record for at least six months preceding any such elections."

to the Church during the preceding six months" would be allowed to "satisfy that requirement of voting by making a financial contribution [in any amount] prior to the election." Judge von Kann explained that the 1996 Bylaws, unlike the invalidated 2012 Bylaws, "do not specify any particular amount of money that is required to be contributed monthly or any particular amount of money that satisfies the requirement of having been a financial contributor for at least six months preceding any election."

The regulations further provided that once those steps were taken, designated registrars would determine and announce (1) the total number of persons registered as Church members, (2) the total number of those registered members in attendance, and (3) whether the quorum requirement (one-third of the total number) was satisfied. If so, the meeting and vote would proceed.[11]

The election to fill the eight vacant seats on the Board allocated to parishioners was held as planned at the General Assembly's annual meeting on October 23, 2016. Judge von Kann attended the entire meeting to confirm that the newly adopted

---

[11] If less than one-third of the total number of registered Church members were present, the meeting would be postponed until the following week, at which time, under Article VIII of the 1996 Bylaws, the presence of any registered members would constitute a quorum.

election regulations were followed. As he recounted in his declaration, approximately six Church members were enlisted to "determine how many of the Church's then-registered 810 members were present." They "circulated through the assembly, carefully counted members in attendance, and then compared their results for accuracy." They determined that 432 Church members were present, which satisfied the quorum requirement. Next, those members whose cards showed they had contributed financially to the Church within the preceding six months, and any members who had not contributed then but who made belated contributions in any amount at the meeting in order to qualify, were found eligible and were allowed to vote. Judge von Kann reported that "[n]o issues arose concerning eligibility to vote."

The election resulted in eight new Board members.[12] Judge von Kann stated in his declaration that he observed "no irregularities or improprieties," that "the meeting was conducted in strict conformity with the 1996 Bylaws and the election regulations," and that "[n]o objections were made to any of the procedures utilized in the election of Trustees, nor to the resulting outcomes."

---

[12] After the results were declared, the Church clergy reported whom they had chosen as the ninth elected Trustee.

On January 21, 2017, the newly elected Board voted unanimously to dismiss this lawsuit. Based on that vote, appellees filed a motion to dismiss for lack of subject-matter jurisdiction. The trial court (by Judge John M. Mott, who had succeeded Judge Ross) granted the motion on the ground that the individuals who brought this lawsuit lacked standing to sue in the name of the Church because the power to act for the Church now rested with the Board elected in October 2016. In agreement with Judge Ross's earlier interim ruling that the proposed 2012 Bylaws had not been legitimately passed, Judge Mott ruled that the Church's 1996 Bylaws remained in effect and that the October 2016 election conformed to those Bylaws.

The court was not persuaded by the plaintiff's argument that the October 2016 election was invalid for the reason that there were no vacancies on the Board to fill at the time the election was held. Judge Mott observed that there was "reason to believe" the July 2014 and March 2015 elections that installed the plaintiff's putative Board members were "invalid." But even if that was not so, the judge said, there still were at least four vacancies on the Board at the time of the October 2016 election because the two-year terms of the Trustees elected in July 2014 had expired by then. (The judge did not mention the March 2016 election.[13]) Since the new Trustees

---

[13] His failure to do so is puzzling, since appellant's opposition to the motion to dismiss reported that the Church held elections on March 27, 2016, to replace the

elected in October 2016 to fill those four seats all voted to dismiss this lawsuit, as did the new clergy-elected Trustee and the permanent and ex officio Board members, Judge Mott reasoned that a validly seated majority of the eleven-member Board had voted to dismiss this lawsuit regardless of whether the prior elections were valid.

On appeal, this court upheld the ruling that the 2012 Bylaws were not properly enacted and that the 1996 Bylaws still governed the Church.[14] We remanded, however, for further proceedings relating to the plaintiff-appellant's contention that there were no Board vacancies to fill in October 2016 because of the previous elections. Noting, in particular, the trial court's equivocal statement that there was "reason to believe" the 2014 and 2015 elections were invalid, we said dismissal on that basis would be unwarranted without "a clearly explained and definitive

four Board members elected in 2014 whose terms were expiring in 2016. The opposition added that "the Church" held elections again on March 12, 2017, to replace the four Board members elected in 2015 whose terms were expiring in 2017, and that the "true Board" continued to "support the prosecution of this action."

[14] *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church*, No. 18-CV-0559, Mem. Op. & J. at 7. We also held, *inter alia*, that the First Amendment did not bar the trial court from making its determinations regarding the Church's Bylaws, the validity of the Board elections, and the standing of the persons who filed this lawsuit, since deciding those questions "required application of no more than neutral principles of corporation law." *Id.* at 6 (citing, *inter alia*, *Jackson v. George*, 146 A.3d 405, 417 (D.C. 2016), and *Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 250 (D.C. 2015)).

determination of that issue."[15]  Moreover, we said, a remand was necessary because the trial court had not addressed the validity of the March 2016 election.  If that election was valid, we explained, it would affect the number of vacancies available to be filled in the October 2016 election (which, in turn, could affect both whether the Board was properly constituted when it voted to dismiss this lawsuit and whether the requisite majority of validly seated Trustees did so vote).[16]

On remand, the court found that the results of the July 2014 and March 2015 elections were invalid because they did not comply with three requirements in the 1996 Bylaws:  (1) the list of eligible voters used in those elections was prepared in accordance with the requirements in the 2012 Bylaws rather than the less restrictive requirements in the 1996 Bylaws; (2) the plaintiff failed to establish that the quorum requirement was satisfied in either election, and there were reasons to doubt it; and (3) the elections took place in months other than October, the month in which the 1996 Bylaws specify the annual meeting of the General Assembly is to be held, and the plaintiff had not established that proper notice of them was provided to the

---

[15] *Id.* at 8-9.

[16] *Id.*  We also noted that the validity of the elections at issue could affect who the proper Church Aleka was at the time the Board voted to dismiss this lawsuit, a question the trial court had not explicitly resolved in its dismissal order.

Church membership. The court found that the March 2016 election was invalid for the first and third reasons. Concluding that eight vacancies therefore existed to be filled in October 2016, the court dismissed the suit for lack of standing.

In this appeal from that dismissal, the burden is on appellant to establish standing to maintain this lawsuit in the Church's name.[17] Appellant contends that the trial court's analysis of the invalidity of the pre-October 2016 elections suffers from a number of legal and factual errors, which we address below. Appellees, on the other hand, argue that we need not address whether appellant lacks standing to sue in the name of the Church because this case is now moot. We address their mootness argument first.

## II. Mootness

Appellees characterize appellant's lawsuit as essentially just a request for a judgment affirming that the elected Board members who filed the lawsuit governed the Church and that their removal from the Board was invalid. According to appellees, granting any relief along those lines, including reinstating the Board that filed this lawsuit, would have no impact on the parties because the two-year terms

---

[17] *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015).

of those Board members have expired, each faction of the Board has continued to hold elections in the years since this lawsuit began, and a declaratory judgment would not accomplish anything. Appellees claim this renders the case moot. We are not persuaded this is necessarily so, however.

While this Article I court is not bound by "Article III's strictures to resolve only 'cases' or 'controversies,'" we typically "hew closely to the jurisdictional decisions of Article III tribunals" resolving issues of mootness.[18] "As a general rule, the mootness doctrine prevents courts from deciding cases 'when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome.'"[19] "The burden of demonstrating that a case is moot falls heavily upon the party asserting mootness."[20] An appeal should be dismissed "when, by virtue of an intervening event, a court of appeals cannot grant 'any effectual relief whatever' in favor of the appellant."[21] But if there is a potentially available remedy,

---

[18] *See In re Bright Ideas Co.*, 284 A.3d 1037, 1042 n.4 (D.C. 2022).

[19] *Geary v. Nat'l Newspaper Publishers Ass'n*, 279 A.3d 371, 372 (D.C. 2022).

[20] *Classic CAB v. D.C. Dep't of For-Hire Vehicles*, 244 A.3d 703, 705 (D.C. 2021) (brackets omitted).

[21] *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*,

it "does not need to be 'fully satisfactory' to avoid mootness[;] . . . even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'"[22]  In *Jackson v. George*, for example, this court reviewed the trial court's order following a bench trial regarding claims brought by church members against individuals who purported to be acting on behalf of the church, including the claim that the defendants improperly terminated their membership.[23]  Although the defendants provided signed letters welcoming the congregants back to the church on the eve of the trial, the congregants claimed injuries beyond their loss of membership that resulted from the defendants "taking control of the church."[24]  Because other relief could still be provided and other claims were unresolved, the case was not moot.

In the present case, it appears the parties continue to have a concrete interest in the outcome of this litigation.  Appellees have not identified any evidence, such

---

139 S. Ct. 1652, 1660 (2019) ("Under settled law, we may dismiss the case for that reason only if 'it is *impossible* for a court to grant any effectual relief whatever.'" (emphasis added) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013))).

[22] *Calderon*, 518 U.S. at 150 (second alteration in original) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

[23] 146 A.3d 405, 409-11 (D.C. 2016).

[24] *See id.* at 416.

as intervening elections that both parties agree resulted in validly elected Boards, to support the notion that the parties' dispute regarding the Church's leadership is of no legal significance.[25] It is true that the two-year terms of the Trustees elected in 2014, 2015, and 2016 have expired, but the dispute did not end with them. Appellees' own assertion that the two factions of the Church have continued to exist at the same time undermines their contention that no continuing controversy exists that may be affected by the outcome of this lawsuit. The validity of the Board that filed this suit may affect the legitimacy of subsequent Boards that represent each faction and their power to occupy and manage the Church. Thus, the resolution of appellant's claims have continuing legal consequences.[26]

---

[25] *See Chafin*, 568 U.S. at 173-74, 176 (concluding that arguments challenging a law's "meaning" or "the legal availability of a certain kind of relief[ ]confuse[] mootness with the merits").

[26] *Cf. Geary v. Nat'l Newspaper Publishers Ass'n*, 279 A.3d 371, 373 (D.C. 2022) (dismissing the claim for declaratory judgment that the plaintiff's early removal from the board was moot because her term had naturally expired and there was no controversy related to the legitimacy of the board as a whole or subsequent elections); *Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016) (concluding that the claim for a preliminary injunction to stop voter registration and a delegate election intended to establish Native Hawaiian self-governance was moot because the election was cancelled, no future ratification election was scheduled, and the non-profit corporation organizing the election was dissolved).

Appellant's complaint requested more than just a declaratory judgment. It sought (and appellant continues to seek) injunctive relief to prevent appellees from occupying or holding themselves out as having control over the Church's "premises or property." Moreover, the record raises questions as to whether appellant has regained control of Church property. Judge von Kann's description of the election that took place in October 2016 noted that "some of the plaintiffs in the above-cited action [i.e., the Trustees who voted to initiate this suit] began to meet and worship in rented space near Silver Spring, Maryland; they declared that they, and not those who continued to meet at the Church's original sanctuary at 1350 Buchanan Street, N.W. were the true Debre Selam Kidest Mariam Ethiopian Church." Appellees do not assert that they or their faction of the Church no longer occupy the Church's premises. To the contrary, appellees' counsel stated during oral argument that public records indicate that the members who follow the ousted Church Board have purchased land to build a new Church. Although appellees' relinquishment of control of church property may not provide all relief appellant initially sought, the court's ability to provide some relief prevents the case from being moot.

Because it appears that a live controversy continues to exist between the parties in this case and the court has the power to provide some relief, we cannot

hold that the case is moot. We turn to our consideration of the trial court's order dismissing the case on standing grounds.

### III. Standing

"In assessing standing, the central 'question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue.'"[27] The Nonprofit Corporation Act of 2010 states that "every nonprofit corporation . . . has the same powers as an individual to do all things necessary or convenient to carry out its affairs including the power to . . . [s]ue and be sued."[28] These powers "shall be exercised by or under the authority of the board of directors of the nonprofit corporation."[29] The Church is incorporated as a nonprofit organization in the District of Columbia, and the parties agree that the Act applies to the Church. In order to sue on behalf of the Church, the Board must be vested with the corporate powers of the organization. The trial court concluded that no validly elected Trustees voted to prosecute this action and that they and their Board

---

[27] *Holmes v. D.C. Dep't of Hous. & Cmty. Dev.*, 231 A.3d 416, 421 (D.C. 2020) (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc)).

[28] D.C. Code § 29-403.02.

[29] *Id.* § 29-406.01(b).

were replaced by a validly elected Board in October 2016, so the Board (or individual members) that originally filed the suit did not have standing to maintain the suit in the name of the Church.

"Where a dismissal motion raises a concern regarding a plaintiff's standing to bring suit, it is a challenge to the trial court's subject matter jurisdiction, and is properly assessed as a motion to dismiss under Super. Ct. Civ. R. 12(b)(1)."[30] When the parties litigating that motion submit materials beyond the facial allegations in the complaint, as the parties did in this case, the "trial court may 'conduct an independent review of the evidence submitted by the parties, including affidavits, to resolve factual disputes concerning whether subject-matter jurisdiction exists.'"[31] If "the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."[32] Ultimately, the "plaintiff bears the burden to establish standing."[33] Although the "issue of subject matter jurisdiction is a question of law" reviewed de novo, where "a factual inquiry is necessary before the trial court

[30] *RFB Props., LLC v. Fed. Nat'l Mortg. Ass'n*, 284 A.3d 381, 385 (D.C. 2022).

[31] *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015).

[32] *Grayson*, 15 A.3d at 246.

[33] *UMC Dev.*, 120 A.3d at 43.

may determine whether it has jurisdiction," this court reviews the trial "court's factual findings under the 'clearly erroneous' standard."[34]

In the previous appeal, we asked the trial court to clarify whether and why it found the 2014, 2015, and March 2016 elections invalid. Because the March 2016 Board election supposedly replaced or reelected the Board members elected by the General Assembly in July 2014, we focus now on the two contested elections of ongoing significance: the March 2015 and March 2016 elections. The trial court held that the March 2015 election was invalid because (1) voter eligibility was determined using (what the court concluded were) stricter requirements from the wrong bylaws rather than following the 1996 Bylaws; (2) a quorum was lacking or at least in doubt; and (3) the meetings were not held during October, the month when the annual meeting of the General Assembly is supposed to take place according to the 1996 Bylaws.

Appellant argues that the court erred in reaching these conclusions. First, it argues that the court improperly interpreted the voting requirements in the 1996 Bylaws because the court did not read all relevant provisions together and ignored

---

[34] *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301, 302 (D.C. 2009).

extrinsic evidence that demonstrated that members actually had to satisfy the same requirements to vote under both those and the proposed but unadopted 2012 Bylaws. Thus, appellant argues, neither the March 2015 nor the March 2016 election was invalid on account of the exclusion of eligible voting members pursuant to the requirements set forth explicitly in the 2012 Bylaws. Second, according to appellant, the court's finding that the March 2015 election was held without a quorum present amounted to "speculation" because it ignored "uncontradicted testimony that a quorum was present." Third, appellant argues that holding the elections in March of each year instead of October did not render the elections invalid because a provision of the Nonprofit Corporation Act of 2010, D.C. Code § 29-405.01(d), specifically provides that "[t]he failure to hold an annual or regular meeting at the time stated in or fixed in accordance with the articles of incorporation or bylaws shall not affect the validity of any corporate action."

## A. Eligibility to Vote

Although, at all relevant times, the bylaws that governed the Church were the 1996 Bylaws, eligibility to vote in the March 2015 election was determined pursuant to the unadopted 2012 Bylaws. That apparently was the case in the March 2016 election as well, inasmuch as that election was held before Judge Ross's ruling that

the 2012 Bylaws had not been approved. The trial court found this error invalidated the elections because the 2012 Bylaws required Church members to meet stricter financial contribution requirements to be eligible to vote than the financial contribution requirements in the 1996 Bylaws — meaning some eligible members were, or may have been, prevented from voting.[35]

"[I]t is well established that the bylaws of an organization are contractual in nature," so we apply "the objective law of contracts, which provides that the written language embodying the terms of an agreement governs the rights and liabilities of the parties."[36] "We look first to the actual language of the contract and give that language its plain meaning."[37] This court will "honor the plain, ordinary and usual meaning of the language and turn to extrinsic evidence only when faced with

---

[35] We are not aware of any direct evidence that any eligible voter was, in fact, denied the right to vote or dissuaded from voting as a result of the error in applying the requirements of the unadopted 2012 Bylaws. There certainly was testimony, however, that the alleged difference between the eligibility requirements in the 1996 and 2012 Bylaws could have materially affected the number of persons voting, because a significant number of Church members did not pay their full dues on a regular monthly basis. *See infra.*

[36] *Wash. Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 876 (D.C. 2006) (internal quotation marks omitted).

[37] *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

ambiguity, i.e., with terms that will bear more than one reasonable interpretation."[38] Whether a contract is ambiguous is a legal question that the court reviews de novo.[39] "[A] contract-interpretation issue becomes a question of fact when, after extrinsic evidence is marshaled, there remains a genuine dispute over the meaning of the provision at issue."[40]

We start with the text of the 1996 Bylaws to identify whether their pertinent requirements are ambiguous. There are three potentially relevant provisions of the 1996 Bylaws concerning membership and voter eligibility. Article V states that membership extends to those who "*pay tithe* to the Church" (among other requirements that are not relevant to this dispute). Article VI, which lists the "Rights and Privileges of Membership," states that "Members of the Debre Selam Kidist Mariam Church shall have the right to vote on all matters brought before the parishioners, *provided that* in order to elect members of the Board and other officials of the Church, members shall have been *financial contributors of record for at least six months preceding any such elections*." Article VII, governing "Termination and

---

[38] *Sanders v. Molla*, 985 A.2d 439, 441-42 (D.C. 2009) (internal quotation marks omitted).

[39] *Aziken v. District of Columbia*, 70 A.3d 213, 219 (D.C. 2013).

[40] *Sanders*, 985 A.2d at 442.

Restoration of Membership," provides that "Membership may also be lost upon failure by a member to *pay dues* within a reasonable period of time." The terms "tithe," "financial contributions," and "dues" are not defined in the 1996 Bylaws, nor do those Bylaws spell out what satisfies the key requirement that members have been "financial contributors of record for at least six months" preceding an election of Board members. It is not clear whether this provision means a member must have paid dues for each of the six months leading up to such an election in order to vote in it; for example, as we have discussed, the provision was not interpreted to impose such a requirement by Judge von Kann and the Church's founder when they held the October 2016 election. The provision is ambiguous on its face.

The unadopted 2012 Bylaws more clearly define who may vote. They state that "[f]or a member to vote, to cast vote and to nominate a candidate, he/she should stay as a member for 6 months and fulfill his/her membership obligation." One of the membership obligations specified is to make a "timely payment of membership fee" in the amount of $20 "every month," unless the member has received an accommodation from Church "management" to pay less. As the trial court concluded, the 2012 Bylaws would thus have required each member to pay dues in each of the six months preceding an election to vote.

The trial court compared the provisions of the two sets of bylaws and found that the 2012 Bylaws were "stricter" because certain individuals who "paid tithes and other financial contributions" but nonetheless did not pay a monthly membership fee would be disenfranchised under the 2012 Bylaws but not under the 1996 Bylaws. While we agree the eligibility requirements of the 2012 Bylaws are clearer, we think the trial court did not properly reach the conclusion that they were "stricter" than the requirements of the 1996 Bylaws. Because the latter requirements were ambiguous, it was necessary to consider extrinsic evidence as to how the 1996 Bylaws had been understood in past elections.

The court did consider and rely on one piece of extrinsic evidence, namely testimony by the head of the Church's financial department, Wuoulita Seyoun, who had verified that members were in good standing for the March 2015 election. She testified that people who merely "pay tithe" or "contribute to the building fund or other special contributions" (but who do not pay their dues) were not added to the membership lists. Although this testimony indicates that some payments may not have qualified someone to vote, it does not directly address the meaning of the requirement that a member be a financial contributor of record for the six months preceding an election, or whether the failure to pay dues in each of those six months is disqualifying.

The parties point to other extrinsic evidence that the trial court did not consider. Appellant cites other testimony from Ms. Seyoun, in which she agreed that "under both" sets of bylaws "there was a requirement to pay dues for the preceding six-month period" in order to vote. Appellant also relies on the testimony of Frehiwot Bekele, who belonged to the Church for over twenty years and was elected to its Board of Trustees in the March 2015 election. He, too, testified that before the 2012 Bylaws were proposed, it was a requirement under the 1996 Bylaws that members had to "have paid their monthly payment of $20 a month for six months" in order to vote for Board members at General Assembly meetings.[41]

There was evidence to the contrary, however. Appellees cite testimony from Dr. Getachew Metaferia, the chairman of the Board of Trustees elected in 2014. He agreed that the text of the 1996 Bylaws does not specify that "financial contributors of record" were required to have paid dues for the six months preceding an election in order to vote because "one of the flaws of this article" is that "it is too general," but he explained that he did not consider tithes (which he defined as 10% of one's

---

[41] Appellant also cites the deposition testimony of appellee Habte that Church dues had been $20 per month since 1988. However, Dr. Habte did not testify as to whether payment of those dues for six months before an election was a voting qualification.

income) to constitute a "financial contribution" to the Church because "most people can't afford" that payment.[42] (Appellees also rely on Judge von Kann's understanding that the relevant provisions of the 1996 Bylaws permit members to vote so long as they made a financial contribution of any kind or amount to the Church in the six months preceding an election, even up to the very date of the election.)

We conclude that the terms of the 1996 Bylaws remain ambiguous and their meaning is in genuine dispute. Because the trial judge did not sufficiently address the extrinsic evidence bearing on that dispute, a remand is necessary for the court to consider the evidence and interpret the relevant provisions of the 1996 Bylaws[43] before comparing them to the 2012 Bylaws.[44]

---

[42] Dr. Metaferia went on to explain that "culturally," the Church does not require a tithe form of payment because the "lion's share of our memberships . . . live on minimum wage" and the Church wants to be inclusive.

[43] *See, e.g.*, *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 709 (D.C. 2015) (remanding for the trial court to consider extrinsic evidence about portions of a purchase agreement that remained ambiguous after analyzing the text of the agreement).

[44] Appellees point to other differences between the 1996 and 2012 Bylaws. Specifically, they cite Article 5.2 of the 2012 Bylaws, which limits membership cards to one per family unless "a husband and a wife apply to be members individually and they are prepared to make separate payments"; provisions that permit someone who is delinquent in paying their monthly membership dues to be

**B. Whether a Quorum Was Present for the March 2015 Election**

The trial court agreed with Judge Ross's findings that there was no quorum at the March 2015 election. The judge summarized the evidence supporting that finding as follows:

> (1) The election report for March 29, 2015 did not specify how many members belonged to the Church but indicated that the top vote getter, Legesse Tessema, received 130 votes; (2) Minutes from the preceding meeting on March 7, 2015 showed that the Church had 564 members, which would require a quorum of 188 members; and (3) Several months into the hearings for the Temporary Restraining Order, plaintiff produced for the first time a new, English-only report of the March 29, 2015 election stating that the Church had 532 members of which 178 were present. This new report did not explain the sudden drop in Church membership from March 7, and it incorrectly stated that 175 members were required to achieve a quorum. Ms. Debela testified that this mistake was a typo. She could not confirm, however, whether 178 members were actually present or whether that number had also been a typo.

---

suspended without notice; and a letter in the record that cites Article 8 as a basis to terminate someone's membership for being "complicit in this unlawful series of challenges to the church's bylaws and the authority of the elected Board of trustees." They argue that these additional examples show that membership was limited in ways that are inconsistent with the 1996 Bylaws. The trial court did not address any of these arguments, so we refrain from addressing them in the first instance.

Appellant takes issue with each of these findings. We review the court's factual findings for clear error.[45] "[T]o find clear error we must review the evidence and be left with a 'definite and firm conviction' that a mistake was made."[46] We agree with appellant that the court's findings fall short of supporting its conclusion that a quorum was not present at the March 2015 election.

First, the fact that the top vote getter received 130 votes does not by itself tend to show that a quorum was not present. If it is correct that 178 members made up a quorum, the top vote getter was properly elected by a majority thereof. On the other hand, as we pointed out above, if that quorum was indeed present, then according to the election report, not all the winning candidates received the necessary majority vote thereof (as the four winners received from 80 to 130 votes). This discrepancy may be evidence that, in fact, fewer than 178 members were present (since 80 votes was considered enough to elect a candidate). But this is not evidence the court took into consideration, and the discrepancy may have other explanations.

---

[45] *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011).

[46] *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 217 (D.C. 2021) (quoting *Spargnapani v. Wright*, 110 A.2d 82, 85 (D.C. 1954)).

Second, we appreciate that the court identified reasons to be skeptical of whether there actually was a quorum present at the March 29, 2015, election. On its face, the election report was conclusory and contained errors; Ms. Debela could not confirm its accuracy or explain how the number of members present was determined; the court was not provided with an actual Church register showing the number of Church members in good standing at the time of the election (which it was necessary to know in order to calculate the required quorum); and perhaps it is suspicious that the report claims the number of members present was exactly the minimum number necessary for a quorum.[47] However, the court went on to question the reported quorum because no explanation was provided for a "sudden drop in Church membership" from the 564 members reported in "[m]inutes from the preceding meeting on March 7, 2015" (a number that would have required a greater number of members present for a quorum). To the extent the court relied on this discrepancy, we think some further explanation, if not reconsideration, is required.

The document the court cited (inaccurately, as constituting "minutes from a preceding meeting") was a letter dated March 7, 2015, from Priest Anteneh and two

---

[47] As we also noted above, the election report contains a cryptic, but perhaps troubling, reference to appellee Anteneh's resignation from the election committee. However, it does not appear that the court took Priest Anteneh's claims into account, except as indicated above.

other members of the Election Committee to the General Assembly and the Board of Trustees, declaring their "inability to continue discharging [their] role" on that committee. The letter objected to "[t]he Board's interference in the work of the Election Committee." As pertinent here, the letter complained that the committee "did not receive [the] list of qualified, dues paying members in time," and that the list provided to the full committee contained only the names and membership numbers of "564 claimed members" with no addresses or other information about them. It is not clear when the membership list was prepared, or by whom. Critically, the letter itself questions the reliability of the membership list, noting that "[a]nother list containing names and addresses of members not examined by the Election Committee was provided exclusively to the Chairman." Given what little is said about the list, it is not clear that the letter supports the court's finding of a "sudden drop" in membership from 564 to 532 members.

Even if there was such a drop between March 7 and 29, appellant argues that the court erred in questioning it, because the membership of the Church had a history of such fluctuation. Indeed, minutes from 2014 indicate that membership dropped shortly before the 2014 election: there were 515 registered members at a meeting on May 18, 2014, but only 414 registered members by July 13. Moreover, according to minutes taken at an emergency meeting held on January 18, 2015, there were then

518 registered members — fewer members than the 532 registered as of the March 2015 election. If there was something suspicious about these fluctuations, the record does not establish it.

Appellant also argues that the court ignored evidence supporting the existence of a quorum. For instance, the court did not address the statement in the minutes from March 29, 2015, that the meeting began after someone ascertained that "a quorum was present," or testimony by Ms. Seyoun that she observed someone count the members present and then heard the secretary announce the existence of a quorum. The court did not reject any of this competing evidence. To be sure, this evidence was conclusory and second-hand, and the court reasonably might have attached little if any weight to it. Nonetheless, taken with everything else, we are persuaded that on remand the court should reassess whether appellant carried its burden to establish more likely than not that a quorum was present at the March 2015 election.

**C. The Month in Which the Elections Were Held**

The trial court found that the elections in March of 2015 and 2016 were invalid because holding them then, instead of in October of each year, violated Article VIII of the 1996 Bylaws. Article VIII requires that there be a "General Assembly of

parishioners of the Debre Selam Kidist Mariam Church once a year in the month of October." Appellant argues the court erred because a provision of the Nonprofit Corporation Act of 2010, D.C. Code § 29-405.01, provides that while "[a] membership corporation shall hold a meeting of members annually at a time stated in or fixed in accordance with the articles of incorporation or bylaws," the "failure to hold an annual or regular meeting at the time stated in or fixed in accordance with the articles of incorporation or bylaws shall not affect the validity of any corporate action."[48]

This court has not previously had occasion to consider this section of the Nonprofit Corporation Act. "We review issues of statutory interpretation de novo."[49] "We first look to see whether the statutory language at issue is 'plain and admits of no more than one meaning.'"[50] "[T]he plainness or ambiguity of statutory language is determined not only by reference to the language itself, but also by considering the specific context in which that language is used, and the broader

---

[48] D.C. Code § 29-405.01(a), (d).

[49] *Bridgforth v. Gateway Georgetown Condo., Inc.*, 214 A.3d 971, 974 (D.C. 2019).

[50] *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)).

context of the statute as a whole."[51]   If necessary, we may look to a statute's legislative history to confirm "that our interpretation is consistent with legislative intent."[52]

We conclude that D.C. Code § 29-405.01(d) saves the Church's actions from being invalid merely because they were taken at, or by a board elected at, a meeting held outside of the month stated in the bylaws for the annual meeting.  The statute states expressly that the failure to hold an annual meeting "at the time stated" in the bylaws "shall not affect the validity of any corporate action."  The statement is unqualified.  The Council of the District of Columbia took the provision from the American Bar Association's 2008 revisions to the Model Nonprofit Corporations Act (MNCA),[53] which had "been adopted widely throughout the United States."[54] We have found no authority to support an alternate reading of § 29-405.01.[55]

---

[51] *Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 745 (D.C. 2021).

[52] *Thomas v. Buckley*, 176 A.3d 1277, 1281 (D.C. 2017).

[53] District of Columbia Code Title 29 (Business Organizations) Enactment of 2010, Report on Bill 18-500 before the Committee on Public Services and Consumer Affairs, Council of the District of Columbia, at 30, 33 (Dec. 2, 2010).

[54] *Id.* at 30.

[55] The sparse precedent by other courts on this topic further confirms our view that the statute speaks for itself.  But in the few cases regarding the interpretation of similar corporate statutes, courts have held that corporate actions are not invalidated

The trial court did not overlook § 29-405.01(d). It reasoned, however, that while "the fact that the elections occurred outside of October did not, by itself, invalidate these elections, this does not remove the obligation to comply with other meeting requirements within the Bylaws." The court found that appellant failed to show that the elections were held "in accordance with the emergency meeting provision of Article VIII," which states that the Board of Trustees may call an emergency meeting of the General Assembly "where circumstances justify such meetings" and provided that parishioners receive proper "notice of such special meetings at least 24 hours in advance." The notice "shall state the reasons for calling the meeting, the business to be transacted at such meeting and the organs of the Church calling the meeting." The court found that appellant had not shown that proper notice was given.

---

simply because they occurred at a meeting outside of the one fixed in the bylaws. *See, e.g.*, *Channel View E. Condo. Ass'n v. Ferguson*, No. 344149, 2019 Mich. App. LEXIS 3745, at *13-15 (Ct. App. July 2, 2019) (discussing a similar nonprofit corporation law and explaining that "the board's failure to hold the annual meeting in April, when it was supposed to have occurred, *did not divest the board of its powers*"); *see also* William Meade Fletcher, 11 Fletcher Corp. Forms § 48:1 (5th ed. 2023) (noting that most jurisdictions have adopted the rule that "failure to hold that meeting at the fixed time [according to the bylaws] does not invalidate corporate action").

We reject this ground for invalidating the March elections for two basic reasons. First, while deficient notice of a General Assembly meeting might well require invalidation of the decisions made thereafter, we are not aware of any evidence that notice was in fact deficient in this case. It does not appear that appellees (or anyone else) challenged the adequacy of the notice they were given of the elections, or that appellees argued in Superior Court that the notice was inadequate. The challenge was solely to the fact that the General Assembly met in a month other than October. In the absence of such a challenge and of any evidence that notice was improper, appellant was not obligated to prove that adequate notice was given; any claim that notice was inadequate has been waived.[56] Second, nothing in § 29-405.01 itself required the Church to try to schedule an emergency meeting before it could obtain the protection provided in subsection (d) for holding its annual meeting at a different time from that contemplated in the Bylaws. We therefore

---

[56] *See* 31A C.J.S. Evidence § 234 ("In the absence of a showing to the contrary, the regularity and validity of corporate acts, proceedings, and records will be presumed."); *cf. Pardo v. Wilson Line of Wash., Inc.*, 414 F.2d 1145, 1149-50 (D.C. Cir. 1969) (recognizing that "there is a presumption of corporate regularity which usually requires the party seeking to have the corporate entity disregarded to come forward with a substantial showing that the corporation was really a dummy for [the court to pierce the corporate veil and for] the person sought to be held liable").

reverse the court's conclusion that the March 2015 and March 2016 elections were invalid because they were held in March instead of in October.[57]

## IV. Conclusion

For the foregoing reasons, we vacate the court's order dismissing the case and remand for further proceedings.

---

[57] We note that appellant also has challenged the validity of the Board's vote in January 2017 to dismiss the instant lawsuit. According to appellant, Dr. Amare Kassaye was still the Church's Aleka and therefore an ex officio member of the Board in January 2017, so he should have — but did not — receive proper notice of the Board meeting. Because appellant has not yet carried its burden to demonstrate standing, it may not raise this claim in this action. Rather, a challenge to the validity of the Board's action based on Dr. Kassaye's purported lack of notice would have to be presented in a derivative action. *See, e.g.*, *Levant v. Whitley*, 755 A.2d 1036, 1049 (D.C. 2000) (asserting a derivative action on behalf of a nonprofit association for injury to the association regarding the failure to follow proper money disbursement procedures). As a result, we refrain from addressing this issue.